We'll now move to case number three, Winstead v. Berryhill, case number 18-2228. We'll begin, Mr. Burns, with you. Thank you, Your Honor. May it please the Court, my name is Timothy Burns for the appellant, Ronald Winstead. The first issue in the case that we're dealing with today is whether an ALJ can dismiss four medical opinions, consistent medical opinions, and cannot represent substantial evidence when he does so. Can he then do so in dismissing them in basically a short sentence or even a footnote? Also, the second issue would be if the ALJ fails to apprise the vocational expert of limitations and concentrations and persistence, does he commit a legal error? Mr. Burns, why don't we concentrate on the second issue first, if that's all right? No, that's fine. On that second issue, explain to us your position with regard to whether or not the hypothetical or the ALJ opinion appropriately followed case law with regard to the inclusion of that CPP. Sure. So when we talk about this issue, CPP issues, we focus mainly on concentration. I mean, that's what kind of O'Connor and Spinner was about in this sense. But I think in this case, and I would have gotten to that in the first argument and may get around to it eventually, but persistence is an issue here. And at no time was the persistence question presented except as an off-task question that was then ignored. And that's in the second hypothetical? I believe so. Second or third hypothetical where he gives the, if the person was off-task for 20% of the time, would that person be disabled? So in VARGA, in YERT, what we're presented with is hypotheticals for simple work-related activities that don't have fast-paced quota-based production requirements. We have less than that here, despite the fact of having, well, roughly four different medical opinions, including the DDB doctors, indicating that he would have a moderate problem concentrating. But also, and I think this is of note, this is on page 122 of the transcript, the DDB doctors noted that he would have difficulty completing a workday or workweek without problems with persisting to task. The technical entry goes, complete a workday or workweek without exhibiting behavioral extremes or performing at a reduced pace, or persistence, excuse me. And this wasn't addressed at all. We don't know, in this case, whether the ALJ's limitation to just simple repetitive work, which involves how quickly a person can learn a job, right? That's an SVP2 type job, which means it can be learned in less than 30 days. It's not a specific limitation in concentration. If a person can learn a job, but then not persist to task and needs constant reminders, he's going to lose that job. And that's where I really think an issue, too, where the ALJ failed to live up to the legal standard that's set in Bargain Yard. As you folks probably noticed from my brief, my main problem with this is dealing with a medical opinion that I thought was interesting in a footnote. The judge did that with Dr. Sideris, who is a consultative examiner for the DDB. He's treated or examined the client and found plenty of clinical findings. He found problems with decreased range of motion, a limping gait, decreased reflexes and sensation. And he said that he wouldn't be able to walk or stand or lift for prolonged periods. But interestingly, he then added, due to his heart and lung problems, he would have difficulty persisting, or he said he would wear out if he did any kind of prolonged lifting and standing. I think that that, again, goes to that persistence issue. If a guy can't physically continue to do a job without wearing out, and if he can't mentally do a job through to its completion without reminders, and as the standards would suggest for competitive employment, then how is he going to sustain any kind of work? And the ALJ doesn't address that. You can't address that in a footnote, which is obviously appended after the judge made his decision and when he was proofreading it, deciding, well, maybe I should mention this so I don't get this back from the appeals counsel. Hold on. Why do you say, are you talking about footnote two? I don't remember which footnote it is in the decision, your honor. It's in the ALJ decision. Right, right. Right. And it's honestly, I missed it the first time I read this decision. I missed where he even addressed it. But it is, it says the consultative examiner's opinion is given some weight, whatever that means, but doesn't have a specific limitation. Yeah, right. That's footnote two. Exactly, okay. And then just says the opinion was based on one exam. So it's not ignoring it. No, no, no. He didn't ignore it. He did address it, but he didn't address the particulars. He didn't articulate what his problems are with this opinion and how it actually affects the ability to work. He just, and as the district court noted, and as the appellee noted, he mentioned, the ALJ mentioned this, Dr. Sideris' name multiple times in his decision, the findings where it's not always the good stuff, but generally the bad stuff where things are normal. But at the same time, I found that to be overly dismissive. And I think it shows that what he's doing is misengineering. He's basically turning this process on his head. He decided, this guy's not disabled, and how do I get there from here? Move the problem back. The problem with all these kinds of cases, it does get whittled down to what he can do. Right. And it may, it's not going to be top of the line, what he means, but it gets down to where you can be a janitor, you can do this, or wash dishes, or you can do certain things. And fortunately or unfortunately, whatever, that means he's not totally disabled. Right. And that's, these are not pleasant cases, they never are. And of course, I mean, when you're dealing with this, sure, the guy's got, you know, a lot of limitations, but is he, down where you get to the concentration, persistence, and pace, you'd start analyzing each of those words, well, okay, now let's put that all into one job. And obviously, they can't do assembly line stuff because of the pressure, and then there are certain other things, but they're, and we would always try to look at everybody, they can at least do some things. And this is the, this is the name of this game, I guess. Right. No, and I would suggest, Your Honor, that doing what we would call simple work, which in the DOT is typically referred to as office, office document clerks, even janitor, which would be above his current exertional level. But to do those jobs, you still have to be able to be told, hey, you know, go do, go clean that room, and the supervisor comes back the next day, and the room's clean. If a person doesn't do that, You mentioned the word supervisor. Right. Which, when you get to this level, there generally needs to be a fairly much hands-on supervisor, this is what we're seeing. This is opposed to sending, giving someone an assignment, say, now go do it. That's maybe disappointing, but that's, that's the problem. So that's what we're dealing with. Right. So, and I think that, to that point, that one of the things that the, that both the ALJ did, and we have Dr. Marlow, Dr. Neville, who will have opinions about this, is that he would have difficulty with people he worked with, including supervisors. At one point, in Dr. Patel's records, which start the case, he actually had homicidal ideation. In other words, he was trying to kill, or planning on killing one of his co-workers. So I think that if you were gonna be his supervisor, you'd have to be very hands-off. So, and that's even if he were able to participate in finishing it. So, I'll just reserve the remainder of your time. Yeah, I'll reserve the remainder. Thank you. Very good. We'll now hear from Ms. Tate. Good morning, may it please the court. I'm Christy Tate on behalf of the agency. In this case, I'm going to be speaking about the first two hypotheticals. The first hypothetical is that the attorney posed the first hypothetical. And that the attorney accounted for all of his limitations in concentration, persistence, and pace when assessing his residual functional capacity. What about Ms. Tate, that first hypothetical? Let's talk about those first two hypotheticals. And specifically, I think I'm on pages 78 to 83 of the record. Ultimately, there's three hypotheticals posed, then another one by the attorney. Page 79, transcript 79, the vocational expert, before listing the jobs that appear in the ALJ's decision, the bench assembler, electronics worker, and production assistant, the vocational expert said, I'm gonna stay away from high-pressure, high-paced jobs. To that end, the vocational expert, based on the limitations outlined in the hypothetical, said, I'm gonna look at individualized jobs that are goal-oriented. And that testimony, in conjunction with the ALJ's reliance on the opinions from the doctors Lovko and Neville from the state agency, who translated the checkbox into a narrative assessment of what Mr. Winstead could do, in spite of his mental limitations, that gives us the assurance that this RFC properly addresses all of his limitations. And I'm sorry, you were quoting from page 79? Page 79. Okay, you may continue. Thank you. So in this case, we are not afoul of Varga and this court's precedence that says that an ALJ cannot simply ignore findings of moderate concentration, persistence, or pace. As this court has pointed out, in Katman, in Johansson, and Milliken, moderate limitations are not work-preclusive. And they aren't in this case as well. And in this case, the ALJ's assessment that Winstead could perform simple, routine, repetitive tasks with few workplace changes, and that addresses his moderate difficulties with concentration, persistence, or pace. What about, wasn't in the second or third question that Judge Brennan was referring to, the hypothetical that was presented, wasn't one of those, the question about being off-task, if he was off-task for 20% of the day? And there, the VE answered no. Right? Where is that accounted for in the ALJ's analysis? Where does the ALJ account for his off-task? Yeah, in other words, an individual that has limitations to a degree that they would have to be off-task for 20% of a work day. Right? It's one thing to say, he can perform simple tasks. Okay? But then, perhaps, but then isn't there a question about, can the individual perform those tasks over the course of a work day? And so here, when the VE answers that question, you know, no, given the way the hypothetical is presented, I just don't see where that's accounted for in the ALJ's analysis. Right. The ALJ asked that question, but in the end, he determined, based on what the state agency doctor said, the state agency doctor's narrative portion says, this individual, with these moderate limitations in concentration, persistence, or pace, could pay attention for sufficient periods to complete tasks. And that is the reassurance we have that we don't need additional, in this case, if he's doing these simple repetitive tasks and the workplace changes are minimal, he will be able to persist throughout the day and doesn't need this extra off-task time. The ALJ asked about it in a hypothetical, but that doesn't mean that it had to be included in the RFC. Well, I guess if you're looking at the task, is that what we're talking about? It could be an assignment. I don't want to hypothetically limit it, but if someone's told to clean up this area, you know, he's going to pick up this, he might do that, and everything, and that's your job. It may take him longer. It may take at the interim where he sits down and rests and does other things, but from A to Z, he would be able to get that done. Now, that's where I look at something where someone is directed to do something that it can do, only it's going to be at a slower pace, it's probably going to have to be less complicated, and you can tell the beginning and the end. And that's just the way I look at it. As I said earlier, these cases are hard to deal with when you get down to what someone is able to do. And another thing I've seen before that I quote sometimes is where it's a job the client doesn't want, and the employer doesn't want him to work there. You put those two things together, and that's usually how they probably sum this up, but that isn't fair because we're trying to look at the hypothetical if-then. So that's kind of the way I look at this. If I may address my opposing counsel's argument about the opinion evidence. The ALJ did not simply dismiss these other opinions. He gave Dr. Siddery, the consultative examiner, he gave his opinion some weight, and the other opinion evidence, Mr. Winstead's challenges to the other opinion evidence has actually been waived. In his opening briefs in the lower court, he presented what the district court called arguments that were skeletal at best. So those arguments have been waived. And in any event, the ALJ properly discussed them. As far as Dr. Siddery's, the ALJ throughout his recitation of the objective evidence, not only did he cite the clinical observations of Dr. Siddery's, including his finding that Mr. Winstead walked with a limp and that his grip strength was only four out of five, but additionally that he was able to easily get on and off the examination table, he had full muscle strength in his shoulders, and he had no sensory deficits. The ALJ discussed all of that, and there's no error in him putting his final assessment in a footnote. To call that error would be to put form over substance. When the ALJ, in regard to assessing a consultative examination opinion, he needs to create the logical bridge. That was done here, and there is no error. Mr. Tate, can you help me with one thing? I just want to better understand this. You make an argument in your brief on page 39 where you're discussing the Varga case, and one of the things you're pointing out is that unlike in Varga, here the narrative portion of this mental RFC form was filled out, as opposed to just a box being checked or something. I know your point is not a mechanical point. Your point is not a process point, or I trust it's not, right? No. Okay. Can you just explain the significance, or how would you encourage us to think about the way this form is filled out or not filled out in the context of the issue that's presented? Because when I read it, I say, hold on, what difference does it make if a box is checked or not checked? I don't understand what point is being made here. Absolutely. In the case of Varga, we just had the checked box. We don't have any narrative. We don't have any way to say, here's an individual that has these limitations. What does that look like when he gets into the job market? And what the narrative assessment tells us is, okay, in a vacuum, this individual has some difficulties keeping pace or showing up on time. But what that looks like in the context of all these medical records is it's a distillation of these doctors' assessment of his medical records. The checked box is an objective. You just check it. There's no nuance. There's no explanation. But when you get down to the narrative, we understand better. Okay, if Mr. Winstead is limited to simple, unskilled work, they say unskilled work, if he is limited in that way and his social interactions are limited, then he can persist without special considerations. It fleshes out. There's only so much you can get from a checked box. But if you have the narrative, you can better understand how this individual's mental impairments will impact his ability to get a job and to perform a job. And then the question has to become, doesn't it, how did the ALJ deal with the substance of the narrative that was provided? Right. Right, because, I mean, we ultimately have to get to the next link there, right? Certainly. Okay. Ms. Tate, one final question with regard to the first hypothetical. It can be read that the circumstances involving Mr. Winstead, his experiences about anxiety, panic attacks, et cetera, would be read from the ALJ's decision as when he's around other people. Aren't there other items in the record or circumstances in the record where Mr. Winstead is tense or anxious or restless, not around other people? And, therefore, wouldn't that factual predicate in the record not have been captured in the ALJ's treatment in the first hypothetical? But the record showed there's no dispute that Mr. Winstead had severe mental. That's not in dispute. The ALJ made that determination at step two. But in terms of the overall record, what we see is more times than not his mental status examinations, he has a depressed, mildly depressed mood or normal, but he's able to be pleasant. He makes eye contact. He has logical thought processes. And to the extent that he has anxiety and some panic attacks, and we note that at the administrative hearing, he didn't mention panic attacks at all. And on the whole, the record shows that he would be able to do this job and that the bulk of his anxiety would be problematic with other people, which is why teamwork would be precluded. Thank you. If there's no other questions, we ask that this court affirm the district court's decision and the ALJ's determination. Thank you. Mr. Burns, rebuttal. Thank you, Your Honor. Just briefly, going back to sort of the Varga issue, the one thing I think is interesting about the discussion about the narratives is that it never appears to the vocational expert. A vocational expert never gets to review that part of the file. A vocational expert reviews the work history, and that's it. So the vocational expert is at basically the mercy of the judge to explain to him what that narrative and those check boxes mean. What this judge did was not apprise the V.E. of those limitations. They're not just limitations in concentration. They're actually limitations in persistence. It's noted by Dr. Marlow, noted by Ms. Neville, and in the Hamilton Center records. As I mentioned in the brief, one of the more troubling incidents to me was an incident that was actually described by the ALJ as a good day that he was having where he couldn't deal with community resources. He had to have the help of his therapist to do that. If you can't make a phone call without getting upset and angry with the people you're calling, I don't understand how you're supposed to be able to apply in a work setting. So I don't think, in my reading of this, that the ALJ properly, in a Varga or Yurts sense, apprised the V.E. of those limitations. And I would also suggest that with the limitations he did assign, again, noted in the briefing, Dr. Marlow and Dr. Patel, the Hamilton Center records, Ms. Neville, all of those people who actually treated and examined him and are medical professionals, noted that he would be unable to attend or complete any tasks on a regular basis. And I think that was rejected by the ALJ, that finding at least, as Ms. Tate noted, gave it some weight sometimes, and things like that, whatever that means. But it certainly wasn't adopted by him. And I thank you for your time. Thank you, Mr. Burns. Thank you, Ms. Tate. The case will be taken under advisement.